FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2014 JUL 11  AM 11 35

STEPHAN HARRIS, CLERK
CHEYENNE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

WYOMING CORPORATE
SERVICES,

Plaintiff,

vs.

CNBC, LLC, a Delaware corporation,
and REUTERS AMERICA LLC, a
Delaware corporation, and DOES 1-10,

Defendants.

Case No. 14-CV-55-F

---

## ORDER GRANTING DEFENDANTS' CONVERTED MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendants' converted Motion for Summary Judgment. Having considered the converted motion, the response, the reply, and otherwise being fully informed in the premises, the Court concludes the converted motion is GRANTED.


### BACKGROUND

In 2014, CNBC re-published a 2011 article by Reuters. Both articles concerned Wyoming Corporate Services's (WCS's) line of business: creating and incorporating businesses. In 2011, Reuters published an article on its wire service detailing this industry. Doc. No. 19-12, pp. 4–7 (2011 Article). The Article chronicled "the mass production of

paper businesses." *Id.* at 4.  It identified Delaware, Wyoming, and Nevada as "hotbeds" for "mass incorporators" because of their "light regulatory touch." *Id.*  The 2011 Article stated how businesses, such as WCS, have a number of companies "for sale" in a number of states. *Id.* at 5.  While noting that services provided by incorporators, such as WCS, "serve legitimate services," the 2011 Article discussed how some utilize their services to further illegitimate/illegal means.  *See id.* at 5 (noting WCS operates "legally," "[b]ut clients of [WCS] have run into trouble").  It provided examples of how some used services provided by incorporation businesses, such as WCS, to create a "maze" of companies and businesses to protect their illegal activities.  For example, it noted how a former Ukrainian prime minister used shell companies and offshore bank accounts to create a "labyrinthine" paper trail to hide stolen Ukrainian government funds.  *Id.* at 5.  One of the companies he used was registered at WCS's former headquarters in Cheyenne.  *Id.*  It also discussed how Ira N. Rubin, as alleged by federal prosecutors, used 18 different "front companies" to further his telemarketing scams.  *Id.* at 6.  One of the companies used was also registered at WCS's former headquarters in Cheyenne.  *Id.*  The 2011 Article alleged that some use shelf companies "[t]o hide who they are and what they are doing."  *Id.*

WCS never sued Reuters based on the 2011 Article.  On January 23, 2014, CNBC re-published Reuters's 2011 Article almost verbatim.  Doc. No. 19-13, pp. 5–9 (2014 Article). The only differences were: (1) the title; (2) the picture used; and (3) the date of publication. Doc. No. 25-1, p. 3 (Affidavit of Gerald Pitts).  On February 4, 2014, WCS sued both Reuters and CNBC for defamation.  WCS sought "at least $10,000,000" in damages.  WCS identified twenty-two allegedly false statements in the 2014 Article.  Doc. No. 2 (Complaint).

On March 31, 2014, Defendants moved to dismiss the complaint. Doc. No. 18. After reviewing the filings attached to Defendants' motion, the Court converted their motion to dismiss into a motion for summary judgment. Doc. No. 24. For the reasons discussed below, the Court concludes the converted motion is GRANTED.

## STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. Rule 56(a); *Mata v. Anderson*, 635 F.3d 1250, 1252 (10th Cir. 2011). In determining whether summary judgment is appropriate, the Court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1269 (10th Cir. 2011) (citation omitted). To survive a motion for summary judgment, there must be more than "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Hull v. I.R.S., U.S. Dept. of Treasury*, 656 F.3d 1174, 1196 (10th Cir. 2011). A fact is material if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

When moving for summary judgment, the initial burden of persuasion rests squarely on the moving party. *Trainor v. Apollo Metal Specialities, Inc.*, 318 F.3d 976, 980 (10th Cir. 2002). The moving party has the initial burden of production on a motion for summary judgment and the burden to establish that summary judgment is appropriate as a matter of law. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the movant carries the initial burden, "the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).


## DISCUSSION

WCS brings a single claim for defamation against Defendants. Doc. No. 2. It alleges the 2014 Article contains "at least" twenty-two false statements. They are:

A. "The CNBC Article's title is 'Investigation unearths secret of the Great Plains.' However, . . . there is no investigation by Reuters, CNBC or anyone else currently being conducted, nor has any investigation been conducted recently."

B. "The Article states that more than 2,000 companies are registered at [] 2710 Thomes Avenue, in Cheyenne, Wyoming."

C. "The Article States that 'the walls of the main room at [2710 Thomes Avenue] are covered floor to ceiling with numbered mailboxes.'"

D. "The Article states that 'a bulky copy machine sits in the kitchen.'"

E. "The Article states that 'in the living room, a woman in a headset answers calls and sorts bushels of mail.'"

F. "The Article [] states that 2710 Thomes Avenue is the headquarters of Wyoming Corporate Services."

G. "The Article states that WCS is 'a business-incorporation specialist[.]'"

H. "The Article states that 'Among [WCS's] offerings is a variety of shell known as 'shelf' company, which comes with years of regulatory filings behind it.'"

I. "The Article states 'A corporation is a legal person created by state statute that can be used as a fall guy, a servant, a good friend or a decoy,' the company's website boasts. A person you can control . . . yet cannot be held accountable for its actions. Imagine the possibilities!' This language is not on the company's website."

J. "The Article states that 'Among the entities registered at 2710 Thomes Avenue, Reuters found, is a shelf company sheltering real-estate assets controlled by a jailed former prime minister of Ukraine, according to allegations made by a political rival in a federal court in California.' However, the company, later identified in the Article as Capital Investments Group, Inc., is not registered at 2710 Thomes Avenue."

K. "The Article states that 'the owner of another shelf company at the address [2710 Thomes Avenue, later identified in the Article as Elite Funding Group] was indicted in April for allegedly helping online-poker operators evade a U.S. ban on Internet gambling.' The company, Elite Funding Group is not registered at 2710 Thomes Avenue. Further, . . . the alleged owner of that company was indicted over two years ago, not in April, as stated in the Article."

L. "The Article states 'all the activity at 2710 Thomes is part of a little-notice industry in the U.S.: the mass production of paper businesses.' WCS is not in the industry of the mass production of paper businesses, nor does it conduct any activities at 2710 Thomes Avenue."

M. "The Article states 'shelf corporations can often be purchased [from WCS] with established bank accounts, credit histories and tax returns filed with the Internal Revenue Service.' WCS is not in the business of selling, and does not sell, corporations with established bank accounts, credit histories or tax returns that have been filed with the Internal Revenue Service."

N. "The Article quotes a Daniel E. Karson as saying 'the purpose is to conceal ownership.' WCS does not conduct business for the purpose of concealing ownership."

O. "The Article states that 'on its website, Wyoming Corporate Services currently lists more than 700 shelf companies for sale in 37 states.' . . . In fact, WCS's website lists only 238 shelf companies for sale, in only 25 states."

5

P. "The Article states that one such company is Brookside Management, formed in December, 2004, selling for $5,995.  No such company is listed on WCS's website."

Q. "The Article states that another shelf company is Knotty Management, formed in May and costs $645.  No such company is listed on WCS's website."

R. "The Article identifies the founder of WCS, Gerald Pitts, as being 54 years old.  In fact, Mr. Pitts is 57 years old."

S. "The Article states that Mr. Pitts is listed as director, president or principal of at least 41 companies registered at 2710 Thomes Avenue."

T. "The Article states that Pavlo Lazarenko, the alleged owner of Capital Investments Group, is currently serving an eight-year jail term in California.  However, other recent media reports indicate Mr. Lazarenko was released in November, 2012."

U. "The Article states that Capital Investments Group is registered at 2710 Thomes Avenue.  The company is not registered at that address."

V. "The Article also identifies a lawsuit filed by Capital Investments Group, February, 2010, in federal court in Delaware.  The Article states that the lawsuit court documents state that Gerald Pitts is 'President, Secretary, Chairman and director [of Capital Investments Group].'  This language is not in the identified complaint, nor is Mr. Pitts the President, Secretary, Chairman and director of that company."

Doc. No. 2, pp. 3–6, ¶¶ 13–34.

It appears the basis for WCS's suit is that between 2011, when the original article was published, and the 2014 re-publication, some of the information, being three years old, is no longer true.

In Wyoming,

[a] defamatory communication is one which tends to hold the plaintiff up to hatred, contempt, ridicule or scorn or which causes him [or her] to be shunned or avoided; one that tends to injure his reputation as to diminish the esteem, respect, goodwill or confidence in which he [or she] is held.

*Hoblyn v. Johnson*, 55 P.3d 1219, 1233 (Wyo. 2002) (quoting *Wilder v. Cody County Chamber of Commerce*, 868 P.2d 211, 224 (Wyo. 1994)).  "Proof that the statement is substantially true is

6

all that is generally required to defend against a charge of defamation." *Davis v. Big Horn Basin Newspapers, Inc.*, 884 P.2d 979, 984 (Wyo. 1994) (citing *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 912 (Wyo. 1992)). "'[I]t is not necessary to prove the literal truth of the accusation in every detail, and that it is sufficient to show that the imputation is *substantially true*, or, as it is often put, to justify the 'gist,' the 'sting,' or the 'substantial truth' of the defamation.'" *Tschirgi v. Lander Wyoming State Journal*, 706 P.2d 1116, 1120 (Wyo. 1985) (quoting Prosser and Keeton, The Law of Torts (5th ed. 1984), p. 842)) (emphasis added).

Put differently, even if a statement is false, the falsity of that statement may be so immaterial when examining the context in which it is made that it cannot support a defamation claim. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) ("The falsity of a statement and the defamatory 'sting' of the publication must coincide-that is, where the alleged defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel."). "It is established that a court should not scrutinize simply the literal references of the language in question, but also should weigh the words 'together with their context.'" *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 502 (3d Cir. 1978) (quoting Restatement, Second, Torts § 563, Cmt. d.). This principle is clearly at work here.

WCS recognizes that minor factual inaccuracies cannot support a defamation claim. *See* Doc. No. 25, p. 5. According to Plaintiff, however, "at some point those cumulative errors snowball into falsehood." *Id.* Plaintiff's argument carries little weight. The alleged inaccuracies in the 2014 Article do not hold WCS up to shame or ridicule, and, therefore, Defendants cannot be liable for defamation.

"The best procedural protection for freedom of speech . . . is found in the remedy of summary judgment in which the courts have utilized freely in such cases.  The chilling effect of litigation and the associated expense and inconvenience frequently have led courts to conclude that summary judgment is the most appropriate remedy in an instance such as this in order to minimize that chilling effect as much as possible." *Dworkin*, 839 P.2d at 914 (citation and quotations omitted); *see also Cinker, Inc. v. Northern Gas Co.*, Inc., 578 F.Supp. 112, 114–15 (D. Wyo. 1983) (Judge Clarence Brimmer) ("Courts have been keenly aware of the advantages of summary judgment in a libel action because these actions potentially have a chilling effect on the free press.  In practice, summary judgment has been frequently granted.").

I.   The Statements Are Not Defamatory

Even if false, the vast majority of the twenty-two allegedly false statements are not defamatory.  The use of the word "unearths" in the title of the 2014 Article (Statement A), misstating that WCS has 2,000 companies registered at its address (Statement B), that there are a lot of mailboxes in its office (Statement C), that it uses a "bulky copy machine" (Statement D), that it has an employee who answers calls and sorts mail (Statement E), or that the Article calls WCS a "business-incorporation specialist"[1] (Statement G) do not hold WCS up to ridicule or shame, and are, therefore, not defamatory.

---

[1] WCS's own President, Gerald Pitts, refers to WCS as "offer[ing] business incorporation services."  Doc. No. 25-1, p. 1.  According to WCS being called a "business incorporation *specialist*," when it only offers "business incorporation services," supports a $10,000,000 defamation claim.

With respect WCS's headquarters being located at "2710 Thomes Avenue" (Statement F), this is false.  WCS no longer conducts business at 2710 Thomes Ave. in Cheyenne, Wyoming.  Rather, WCS's headquarters is now located about 8 blocks south at 1712 Pioneer Ave.  But this simple discrepancy is the result of the three-year difference between when the 2011 Article ran and when CNBC re-published it in 2014.  Like many businesses, WCS has moved.  This type of factual inaccuracy, however, hardly supports a defamation claim.  No reasonable person would conclude that misstating a company's address holds that company up to shame or ridicule.  At worst, such an inaccuracy may lead to the current resident of 2710 Thomes Avenue receiving some of WCS's mail.

With respect to whether Mr. Pitts is 54 years old (Statement R), Mr. Pitts is not.  He is 57 years old.  This is a natural occurrence given that the 2011 Article, re-published by CNBC, is three years old.  Again, however, this cannot support a defamation claim.[2]

With respect to "Brookside Management" (Statement P) and "Knotty Management" (Statement Q) being listed for sale on WCS's website, neither is currently listed for sale  However, no reasonable person would consider such statements to be defamatory.  Other than the incorrect statement that they are listed for sale on WCS's website, there is no other mention of them in the 2014 Article.  In fact, WCS's website lists a number of other companies for sale in Wyoming, ranging from $9,995 to $645.  These companies go by many different names.  While the companies listed for sale in the 2014 Article are no longer for sale, the point is the same: WCS sells companies on its website.  The fact the names are different today than they were three years ago hardly makes such inaccuracies defamatory.

---

[2] Moreover, WCS has no standing to sue for defamation of a third party.

9

WCS argues it only has 238 available in 25 states, and not "more than 700 shelf companies for sale in 37 states" (Statement O). Even assuming this is true such a factual inaccuracy is not defamatory because it does not hold WCS up to ridicule or shame. The "gist" of the statement is the same: WCS lists hundreds of companies for sale in a variety of states on its website.

With respect to the statement that WCS "is part of a little-noticed industry in the U.S.: the mass production of paper businesses" (Statement L), it also cannot support WCS's defamation claim because it does not visit ridicule or shame upon WCS. Moreover, the statement is substantially true. On WCS's own website it lists hundreds of "Aged (Shelf) Corporations" available for sale in more than half the states. http://wyomingcompany.com/aged-corporation/. In the "Prices" section of its website under the "Aged (Shelf) Corporations" heading, WCS states it offers "a limited number of previously formed, unused corporations." http://wyomingcompany.com/prices-top/. Whether WCS is actually a part of the "mass production" of paper businesses, is irrelevant because there is no clear definition of what qualifies as "mass production." What is known, however, is that WCS does offer paper companies (i.e., "Aged (Shelf) Corporations") for sale on its website.[3] Consequently, the "gist" of this statement is substantially true, and, therefore, not defamatory.

With respect to the statements that WCS sells shelf corporations "with years of regulatory filings" (Statement H) or that come with "established bank accounts, credit

---

[3] The Court counted roughly 384 companies for sale in 27 states. Granted, a small number of these listed companies listed for sale have "[n]ot a shelf company" in parentheses next to the company's name. However, all 384 companies are found in the "Aged Shelf Companies" section of WCS's website.

histories and tax returns filed with the Internal Revenue Service" (Statement M), even if false, these statement do not hold WCS up to shame or ridicule. In any event, the "gist" of this statement is substantially true. WCS offers Aged (Shelf) Corporations that "come with Certificates Of Good Standing from the state, Certified Articles of Incorporation from the state, . . . 20 pre-printed stock certificates, corporate seal, suggested meetings minutes and one year of Registered Agent Services." http://wyomingcompany.com/aged-corporation/. Moreover, in its response, WCS admits that "[t]hese 'shelf' companies are maintained only by filing the required annual report with the Secretary of State." Doc. No. 25, p. 7.

WCS takes issue with the quote by Daniel E. Karson stating "the purpose is to conceal ownership" (Statement N). This also is not defamatory because it does not cause WCS shame or ridicule. Moreover, this statement is Mr. Karson's opinion. In other words, it cannot be proven true or false, and, therefore, is not defamatory. The context within which the statement was made dealt with Mr. Karson's view of the industry as a whole, and not just WCS. Doc. No. 19-13 (2014 Article), p. 6 ("They just slot in your names, and you walk away with the company. The purpose is to conceal ownership."). The statement does not imply "the allegation of undisclosed defamatory facts as the basis for [Mr. Karson's] opinion." Rest. (Second) of Torts, § 566 (1977); *see also Spence v. Flynt*, 816 P.2d 771, 775 (Wyo. 1991) (following Rest. (Second) of Torts, § 566 (1977)). Rather, the statement is Mr. Karson's opinion about the purpose of the incorporation industry as a whole based on a person's relative ease in being able to buy a shelf corporation. Currently, there is nothing illegal or shameful about hiding a person's ownership in a company.

11

WCS complains about the 2014 Article attributing the following statement to WCS's website: "A corporation is a legal person created by state statute that can be used as a fall guy, a servant a good friend or a decoy. A person you can control . . . yet cannot be held accountable for its actions. Imagine the possibilities!" (Statement I). WCS complains this statement is not on its website. However, there is nothing defamatory about it. There is no assertion that WCS is in the business of helping others engage in illegal activities. The statement merely conveys what a corporation can provide given current incorporation laws—not what WCS is capable of.[4]

With respect to the statements concerning Capital Investments Group, Inc. (CIG) (Statements J and U), WCS's complaint is that CIG is not registered at 2710 Thomes Avenue. Again, WCS is correct—CIG is no longer registered there. However, this is because the 2014 Article is a re-print of the 2011 Article.[5] In any event, a factual inaccuracy about where a third party company is registered is not defamatory because it does not hold WCS up to shame or ridicule.

The statement concerning Elite Funding Group's (EFG's) owner being indicted in April 2013 (Statement K) and EFG being registered at 2710 Thomes Ave. is also not defamatory. WCS complaint about this statement is that "the alleged owner . . . was indicted over two years ago, not in April [2013]" and EFG is not registered at 2710 Thomes Ave.

---

[4] On its website, WCS does highlight that "A Wyoming corporation or LLC offers its officers and directors the highest degree of protection from lawsuits filed by disgruntled creditors or overzealous plaintiff attorneys. Doing business as a Wyoming Corporation or LLC can give you asset protection and business privacy." http://wyomingcompany.com/.

[5] A review of Wyoming's Secretary of State's records reveals that at the time of the 2011 Article, CIG was registered at 2710 Thomes Ave. https://wyobiz.wy.gov/Business/FilingDetails.aspx?eFNum=251229187177063041104200110075171204123153219093.

Such factual inaccuracies, however, do not cause WCS any shame or ridicule. Moreover, WCS does not even have standing to complain about this statement because, as pointed out by WCS, it is not located at 2710 Thomes Ave. and the statement concerns a third-party being indicted, not WCS.

With respect to the statement regarding Mr. Pitts being "listed as director, president or principal of at least 41 companies registered at 2710 Thomes Avenue" (Statement S) and the statement regarding Pavlo Lazarenko being jailed for eight years in California (Statement T), WCS lacks standing to sue based on them. See *New York Times Co., v. Sullivan*, 376 U.S. 254, 287 (1964) ("We also think the evidence was constitutionally defective in another respect: it was incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' respondent."). To support a defamation claim, the alleged defamatory statement must "hold *the plaintiff* up to hatred, contempt, ridicule or scorn[.]" *Hoblyn*, 55 P.3d at 1233 (citation omitted) (emphasis added). Statements S[6] and T[7] involve individuals other than WCS. Consequently, WCS cannot base a defamation claim on them. Finally, WCS's complaint about the statement that Mr. Pitts is the President, Secretary, Chairman and director of CIG (Statement V), cannot support a defamation claim because it does not concern WCS.

---

[6] There is nothing defamatory about saying a person is the registered "director, president or principal" of a number of companies.

[7] In any event, with respect to Mr. Lazarenko, WCS's main complaint is that Mr. Lazarenko was released in November of 2012 and is not "currently serving an eight-year jail term." WCS does not appear to dispute that Mr. Lazarenko did serve a jail term. The alleged defamation appears to result from the 2014 Article being a re-print of the 2011 Article, which, at the time, was factually correct concerning Mr. Lazarenko's jail term. Even though factually incorrect today, such a factual inaccuracy does not qualify as defamatory.

II.   <u>Defamation by Implication</u>

Based on WCS's response to Defendants' motion, it appears the basis for WCS's suit is that the 2014 Article carries the following implications:

1. "[That] Plaintiff is in the business of aiding and abetting illegal activities of the sort specified in the article[.]"

2. "[T]hat [Plaintiff] [] is in the business of offering illegal business solutions to clients."

3. "[T]hat Plaintiff's clients generally were criminals or engaged in criminal activity."

Doc. No. 2, pp. 7–8, ¶¶ 44, 54.

WCS focuses its attention on how the 2014 Article implies that WCS is in the business of aiding others in committing criminal acts.  Doc. No. 25, pp. 3–4 ("The true defamatory sting of the article is to allege that WCS sells shell and shelf companies for the purpose of permitting others to engage in criminal enterprises. . . .  The article casts WCS in a negative light by associating it with only other businesses or individuals who have been charged or found guilty of crimes."); p. 4 ("The article casts WCS in a negative light by associating it with only other businesses or individuals who have been charged or found guilty of crimes."); *see also id.* at 9 ("The 2014 Article is defamatory because it may reasonably be interpreted to convey statements or implications which are false . . . [and] uses special terms to convey a specific impression, not of an industry, but of WCS.").

"A defamation by implication stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). "'The theory of defamation by implication recognizes that the reputational injury caused by a communication may result not from what is said but from what is implied.'" *Heyward v.*

*Credit Union Times*, 913 F.Supp.2d 1165, 1189 (D. N.M. 2012) (quoting New Mexico case law). "A defamatory implication must be present *in the plain and natural meaning* of the words used." *Chapin*, 993 F.2d at 1092 (citing Virginia law)[8] (emphasis added). "[B]ecause the constitution provides a sanctuary from truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true." *Id.* "The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author *intends* or *endorses* the inference." *Id.* (citing *White*, 909 F.2d at 520) (emphasis added). "[A]ll of the court of appeals that have considered cases involving defamation by implication have imposed a similar actual intent requirement." *Dodds v. American Broadcasting Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (citing *Chapin* and *White*).

There is no allegation in the Complaint that Defendants intended or endorsed the inference WCS attaches to the Article. Moreover, nowhere in the 2014 Article does it state that WCS knew about or participated in the illegal activities being conducted by those that purchase and register companies with WCS. In fact, the 2014 Article quotes Mr. Pitts as stating WCS "fully complies with the law and doesn't have any knowledge of how clients use the companies he registers." Doc. No. 19-12, p. 5. Although Mr. Pitts "recognize[s] that business entities (whether aged, shell or traditional) *may be* used for both good and ill." *Id.* (emphasis added). The 2014 Article goes on to state that neither Mr. Pitts nor WCS have

---

[8] "Although [Wyoming's] common law of libel governs this diversity case, the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern." *Chapin*, 993 F.2d at 1091–92. There can be no serious dispute that both Defendants are member of the press. Moreover, because there is a dearth of case law regarding defamation by implication in Wyoming, it is appropriate for this Court to look beyond Wyoming's boundaries for guidance.

ever been sued or sanctioned," and that businesses such as WCS are "perfectly legal." *Id.* at 4–5. A fair reading of the 2014 Article does not carry the implication WCS seeks to attach to it. While the 2014 Article as a whole chronicles how some use incorporation services like WCS to conduct illegal activity, it makes a point to state that the services offered by WCS are perfectly legal.

The thrust of WCS's defamation claim is the alleged implication it believes is derived from the 2014 Article: that WCS is in the business of aiding others in forming businesses which are then used to further illegal objectives. After reviewing the 2014 Article as a whole, however, no reasonable person could reach such a conclusion. The "gist" of the 2014 Article is how some utilize the services offered by WCS, that of secrecy, privacy, and anonymity, to further illegitimate schemes. The Article makes repeated references to the fact that WCS has never done anything illegal, and that the production and sale of paper businesses is perfectly legal.

CONCLUSION

For the reasons discussed above, Defendants' converted motion for summary judgment is GRANTED. WCS seeks to capitalize on the re-publication of a three year old Article by latching on to minor factual inaccuracies. The defamatory sting WCS attaches to the Article does not exist. While some of the statements in the 2014 Article are no longer literally true, the "gist" is still substantially true: WCS is in the business of incorporating companies to be purchased by others; the main selling point is the "privacy" WCS's incorporation services can provide; and some have taken advantage of this "privacy" in

16

order to further their own illegal activities.  The 2014 Article clearly states that WCS's business is "perfectly legal," but that some who use its services do so for illegal means.  A fair reading of the 2014 Article as a whole does not, as WCS alleges, leave the impression that WCS actively facilitates these illegal activities, or even knows about the illegal activities of some of its clients.  Moreover, WCS has not even alleged that CNBC intended or endorsed such an inference.  The First Amendment does not allow litigants, like WCS, to seize upon minor inaccuracies in a publication to sue a publisher for defamation.

IT IS ORDERED Defendants' converted motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

Dated this ___11___ day of July, 2014.

_____
NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE